The adjudication of the material issues of this cause rests upon an appraisement of the credibility of the divergent and discordant evidence. At the final hearing, truth indubitably vanquished fabrication.
The object of the bill is to foreclose a mortgage purporting to encumber certain real estate situate in the City of New Brunswick. The defendants alleged to be in possession of the mortgaged premises are the owner, Traymore Company, Inc., and James Kane, Helen Szabo, Charles W. McNerney and Piros Kiraly. The complainant's bill has been taken as confessed against the defendants James Kane, Charles W. McNerney and Piros Kiraly. *Page 450 
The field of controversy has been established by the answer and counter-claim submitted by the defendants Traymore Company, Inc., and Helen Szabo. Concisely stated, the answer of these defendants denies that the premises are subject to the lien of the mortgage and controverts the existence of the alleged mortgage debt. The answer embodies the averment that Charles W. McNerney, in performance of his obligations expressed in a contract executed on April 10th, 1937, satisfied the mortgage debt and fraudulently caused the bond and mortgage to be assigned without consideration to the complainant. The counter-claim of these defendants is leveled against the complainant and the defendant Charles McNerney. It charges that the mortgage debt was in fact paid by McNerney and that McNerney, perhaps initially obliged to accede involuntarily to a proposed plan of deception resulting in the assignment of the mortgage to the complainant, nevertheless in truth discharged the mortgage debt. The counter-claim prays for a decree perpetually enjoining the prosecution of a suit by the complainant to foreclose the mortgage, directing the cancellation of the mortgage and adjudicating that the assignment of the mortgage to the complainant was null and void. To this amplitude, the counter-claim will be respected. These defendants also ask that the defendant Charles McNerney, having breached an agreement to be presently mentioned, be commanded "to account for all moneys received by him from the income and assets of the business of the Traymore Company and Helen Sbazo." This prayer for an accounting by the defendant McNerney is not germane to the subject-matter of the present foreclosure suit, and such relief will not be considered. Rule 28. It is at once apparent that the complainant was not a party to the agreement by virtue of which the accounting is requested, and it is not alleged that the complainant expressly subjected his alleged mortgage debt to any claim for unliquidated damages which might arise from a breach by McNerney of that agreement.
Exhibited here are a bond and mortgage executed and delivered by Frank Szabo and Helen Szabo under date of April 2d 1931, to Alex Varga and Elizabeth Varga, to secure *Page 451 
the payment of $3,000 on April 2d 1936, with interest. The mortgaged premises, after several intermediate conveyances, were ultimately acquired by the defendant Traymore Hotel, Inc., in which corporation Helen Szabo, her son-in-law, Charles McNerney, and her daughter, Elizabeth McNerney, were the stockholders. The property was devoted to a cafe and hotel business identified by the name, Pullman Hotel and Cafe.
On April 10th, 1937, for reasons which now may be confidently inferred, an agreement was sanctioned by these stockholders whereby Mrs. Szabo retired from active participation in the conduct of the business and the enterprise was ceded to McNerney and his wife. The bargain was not unilateral. Mrs. Szabo was to continue to have her room and board at the hotel and receive a monthly allowance of $20 for her personal use. In consideration of the profits, Mr. and Mrs. McNerney obligated themselves to pay all of the current expenses of the business and of the Traymore Company, specifically the monthly payments to a building and loan association holding a first mortgage on the premises, the necessary payments of principal and interest on the Varga mortgage, which is now being foreclosed, the taxes, water rents, insurance premiums, and other similar expenditures.
Business prospered, but unhappily Varga and his wife soon insisted upon the payment of their mortgage. Conferences between McNerney and the attorney of the mortgagees ensued. McNerney had paid $500 in reduction of the mortgage debt. His efforts, however, to induce a postponement of the threatened foreclosure of the mortgage were unavailing. He realized that the loss of the property would uproot his business. He began to accumulate the receipts of his trade, ignoring temporarily the bills payable. He divulged his plight to one Hoffman, a salesman through whom he purchased alcoholic beverages. In him he found a compliant but timid and cautious patron. Hoffman would supply the deficient financial means to discharge the mortgage, but a loan by a dealer to a liquor licensee must be concealed. It was to polish off this resolute design that the complainant, a personal friend of McNerney, was ushered into the transaction. *Page 452 
The credible evidence reveals that on the morning of November 17th, 1937, Hoffman, the salesman, discounted a promissory note at the First National Bank of South Plainfield and received a cashier's check for $500. McNerney met Hoffman at the bank by appointment. Hoffman endorsed his check to the order of McNerney, who immediately endorsed and collected at the bank the proceeds of the check. The evidence exposed the fact that McNerney then visited the National Bank of New Jersey at New Brunswick, where he withdrew from the demand account of Pullman Hotel and Cafe the sum of $1,200 and the sum of $500 from his savings account. Fortified with $2,200 or more in cash, McNerney and the complainant, Johnson, made their appearance at the office of the attorney of the mortgagees. Some persuasion was exerted to induce the mortgagees to accept in payment a sum less than the amount due on the mortgage. It is said that the mortgagees, in a characteristic state of obduracy, insisted inflexibly upon the payment of the principal of $2,500, but ultimately agreed to accept $50 in payment of the accrued interest which then amounted to $140. These terms were beyond the present financial ability of McNerney to grasp. The negotiations finally resulted in the payment of $2,250 to the mortgagees in cash and the delivery to them of a promissory note made by McNerney for the sum of $300. This note he subsequently paid. The attorney of the mortgagees, who overheard the conversations, entertained the impression that "the beer man was supplying the money." Assuredly, the complainant, Johnson, at the time of his alleged acquisition of this bond and mortgage, did not possess sufficient funds to meet his own personal obligations, much less to invest in a real estate mortgage. Nevertheless, an assignment of the bond and mortgage to the complainant was prepared and executed by the mortgagees.
Additional circumstances of significance deserve mention. The assignment of the bond and mortgage has never been recorded. At the final hearing the complainant could not recall the amount of principal or interest due on his bond and mortgage. He confessed that he had never received or sought any payments of principal or interest. He acknowledged *Page 453 
that he never received or requested fire insurance to protect his lien. Illuminating is the testimony of the insurance agent, who deposed that at the maturity of the policies covering the mortgaged premises in August, 1938, McNerney instructed him to reduce the amount of the insurance and informed him that the second mortgage (the mortgage in suit) had been paid.
An unfortunate eventuality undoubtedly inspired McNerney to promote the institution of this suit. Marital discord has separated McNerney and his wife. The wife and her mother have confederated. This suit has the appearance of a retaliatory attack.
There is, of course, a discordant and incongruous tale which I have not omitted to consider. It recounts that Hoffman, the beer salesman, delivered to McNerney at South Plainfield on the morning of November 17th, 1937, the sum of $1,000 to be loaned to the complainant. The production of the bank records constrained him to explain that he borrowed $500 from the bank, but fortuitously he had $500 in cash in his pocket. At the time he parted with his money, he did not receive from Johnson a receipt, or any other evidence of the loan. He admits that he was not then informed of the financial responsibility, if any, of Johnson, although he recalled that Johnson had on some previous occasions borrowed $5 or $10 from him. He maintains that on the following day he obtained two promissory notes, each for $500, from Johnson, one of which was paid and destroyed. A promissory note bearing date November 18th, 1937, for $500 signed by Johnson, was exhibited in a noticeably immaculate and unblemished condition.
The complainant, Johnson, avowed that having augmented the loan of $1,000 from Hoffman with $1,250 which, he asserts, he had recently accumulated, he was able to pay $2,250 to the mortgagees. Oddly, in purchasing the mortgage he did not sign the $300 note which constituted the balance of the consideration.
McNerney, confronted with the records of his bank accounts, acknowledged that he withdrew $1,700 from these accounts on November 17th, 1937, but declared that he gave *Page 454 
this money, or a substantial part of it, to his mother, Sophie McNerney, in reduction of an indebtedness which he owed to her. His mother, on direct examination, confirmed his explanation, but on cross-examination this elderly lady became confused and erroneously assumed that she was to testify that she loaned money to her son on November 17th, 1937 — a pathetic episode.
Further comment could, but need not, be made concerning the capricious components of the evidence contrived on behalf of the complainant.
The factual conclusion is that there is nothing due and owing to the complainant on the bond and mortgage mentioned in the complainant. Penetrating the superficial aspect of the transaction on November 17th, 1937, the genuine intent was to satisfy the mortgage debt and discharge the lien upon the mortgaged premises.
Counsel will be heard relative to the form and substance of a decree to be advised affording the answering defendants the relief to which they are equitably entitled. *Page 455